## CAMELLIA CITY TELECASTERS, INC., Plaintiff,

v.

## TRIBUNE BROADCASTING COMPANY, INC. and WGN of Colorado, Inc., Defendants.

### Civ. A. No. 84–M–41.

United States District Court,
D. Colorado.

March 1, 1991.

Frederick P. Furth, Craig C. Corbitt, Frederick J. Geonetta, Brien B. Kirk, Furth, Fahrner & Mason, San Francisco, Cal., Gerald L. Bader, Jr., Jeffrey M. Villanueva, Bader & Villanueva, Denver, Colo., for plaintiff.

John R. McCambridge, Darrell J. Graham, Grippo & Elden, Chicago, Ill., Thomas B. Kelley, Cooper & Kelley, P.C., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This is an action to remedy alleged violations of the Sherman Act, 15 U.S.C. §§ 1 and 2. The plaintiff, Camellia City Telecasters, Inc. (Camellia) claims that the defendants, Tribune Broadcasting Company, Inc. and WGN of Colorado, Inc. (Tribune) illegally restrained trade in the Denver commercial television market by tying Tribune's purchases of "quality syndicated programming" in New York City (New York) and Chicago markets to such purchases in the Denver market in "group deals".[1]

---

1. Although the defendants have not raised the    issue, this court is skeptical about the applicabil-

Camellia asserts that Tribune obtained these group deals through the illegal use of its dominant market power by conditioning its purchases of programming in New York and Chicago on the syndicators' agreement to sell the same programming to Tribune's Denver station, KWGN. The plaintiff contends that Tribune's objective was to prevent Camellia's Denver television station, KDVR, from establishing a competitive position in the Denver market.

On March 25, 1987 this court entered a memorandum opinion and order denying Tribune's first motion for summary judgment, addressed to the issue of market power. The defendants contended that the plaintiff had failed to show that Tribune had sufficient market power in the New York and Chicago markets (the tying product) to coerce syndicators to sell the same programs to the Denver station (the tied product). In denying that motion, this court considered the parties' conflicting definitions of the relevant product market and concluded that there was sufficient support for the plaintiff's position that market power should be defined by Tribune's market shares of "quality syndicated programming" shown by independent television stations in New York and Chicago to create a disputed issue of material fact. Additionally, the court concluded that it could not rule, as a matter of law, that the defendants' market shares were too small to support a finding of sufficient market power to prove a tying claim.

At a scheduling conference on May 1, 1987 the court directed Camellia to file a trial notebook setting forth an offer of proof on the essential elements of its tying case: relevant market, market power, and coercion. In response to Camellia's submissions, Tribune filed a second motion for summary judgment on Camellia's section one tying claim. This second motion is based on the contention that Camellia has failed to offer adequate evidence that Tribune forced syndicators to sell to KWGN in Denver by conditioning the purchase of programs for Tribune's stations in New York and Chicago on the Denver purchases.

■ Camellia argues that summary judgment is not favored in complex antitrust cases, particularly in tying cases, since conditioning can be proved through circumstantial evidence. All of the cases relied on by Camellia pre-date *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), where the Court held that summary judgment is appropriate in antitrust cases. Since *Matsushita*, courts have rejected the argument that summary judgment in antitrust cases is different from other types of lawsuits. *See Mount Pleasant, Iowa v. Assoc. Elec. Co-op, Inc.*, 838 F.2d 268, 274 (8th Cir.1988); *Texaco Puerto Rico, Inc. v. Medina*, 834 F.2d 242, 247 (1st Cir.1987).

■ The plaintiff defeated the first motion for summary judgment by asserting the narrowest possible definition of the relevant product market—syndicated programming with a 3.0 or higher Arbitron audience rating shown by independent stations. As indicated in the earlier opinion, that definition excludes almost eighty percent of the syndicated programs available in the relevant period of time and enabled Camellia to argue that a question of fact existed as to whether Tribune had sufficient market share in the New York and Chicago markets to find the market power necessary to a tying claim.

Camellia listed 42 programs meeting its definition of "quality syndicated programs." Nothing has been shown about 17 of those programs. Tribune has presented affidavits from the syndicators of the remaining twenty-five programs directly denying the allegations of conditioning and coercion. It is undisputed that Tribune invested in the production of six of them: "Ghostbusters", "Charles in Charge", "Nadia", "GI Joe", "TV Net", and "What a Country". Participation in the cost of producing the program puts Tribune in a different position from all other stations competing for the right to show those pro-

ity of a tying claim to purchasers rather than sellers. The anticompetitive effects of this type of abuse of monopolistic power may not be present in the context of a monopsony.

grams. Therefore, these six programs are not relevant to the plaintiff's tying claim.

Six programs fail to meet Camellia's definition of tying because they were not purchased by Tribune's Denver, New York and Chicago stations. No Tribune station ever purchased "TV One". Tribune's New York and Chicago stations never purchased "Hart to Hart". Tribune purchased "SCTV", "Police Story" and "Volume IV" in Chicago and Denver, but not New York, and it purchased "Gobots" for its Denver and New York stations, but not for its Chicago station.

Tribune purchased the thirteen remaining programs in group transactions. Camellia concedes that group purchases are not unlawful if they are freely negotiated. Circumstances surrounding three of the thirteen transactions indicate unquestionably that Tribune did not force the syndicators to sell the programming in Denver. The syndicator, not Tribune, initiated a group purchase of the "Lou Grant" program. Tribune acquired "Hill Street Blues" and "Lou Grant" in a group deal from Victory. Victory's general policy was to license product in individual markets. Accordingly, it had rejected several group offers from Tribune prior to this transaction. However, the producer, The Mary Tyler Moore Company, refused to release the "Hill Street Blues" series for syndication unless Victory had a commitment from a group of stations. Tribune offered to license "Hill Street Blues" for all of its stations. Victory accepted the offer to get the syndication rights. Victory wanted to include "Lou Grant" in the transaction because it previously had problems selling that program. Victory needed a large financial commitment to syndicate "Hill Street Blues" and wanted to license the "Lou Grant" series, a less appealing product. Tribune wanted the "Hill Street Blues" series for all of its stations, and was willing to let Victory tie "Lou Grant" into the transaction. The evidence describes a legitimate course of negotiations, free from any forcing by either party.

The parties present evidence on two "Fame" transactions. Initially, Tribune offers evidence that it licensed the "barter" version of "Fame", the version aired weekly, for its New York, Chicago and Denver stations only after Fox Network refused to renew an agreement to air the show on its New York, Los Angeles, and Chicago stations. During the time of that agreement, Fox carried Fame in the major markets, and Tribune carried it only in Denver. Camellia contends that the "strip" version, the version aired daily, is the relevant "Fame" program. However, Camellia fails to point to any direct evidence that Tribune purchased the strip version of Fame in a group transaction. Tribune's replacement of Fox Network in licensing the barter version of Fame in New York and Chicago after it already had the program in Denver eliminates that program from the plaintiff's list.

The "Smurfs" transaction contradicts the contention that Tribune used market power in New York and Chicago to get programs for its Denver station. In the 1986–87 season, Tribune licensed "Smurfs" for its New York, Chicago and Denver stations. However, in the next two seasons, the syndicator sold "Smurfs" to Camellia's Denver station, and to Tribune's New York City and Chicago stations.

Although Tribune acquired the ten remaining programs in group deals, there is insufficient evidence to show it used tying. Tribune purchased these programs for its stations in New York, Chicago and Denver. The syndicators' affidavits deny that they were forced into these transactions. The plaintiffs contend that these affidavits should be ignored because they are conclusory and the affiants are persons monetarily interested in continuing business relationships with Tribune. Camellia has taken the depositions of all of these affiants. None has recanted or contradicted anything in his affidavit. The plaintiff's efforts to discredit these affidavits are not persuasive. The direct denials of conditioning and coercion are uncontradicted by any countervailing direct evidence.

The plaintiff correctly argues that antitrust violations are commonly proved by circumstantial evidence. It says that the

group deals are given a sinister tone by Tribune's internal documents and the Denver market conditions resulting from the entry of KDVR in 1981. Camellia's president, Jack Matranga, and its expert witness, Dr. Paul, believe that market to market bidding is so much more in the syndicators' best interest that they would not engage in group deals unless forced to do so by the threat of losing the New York and Chicago markets. The logic of the plaintiff's argument is that syndicators would not sell in group deals unless coerced; group deals were made by Tribune; therefore, Tribune coerced these sales. The argument is simplistic and is contradicted by the direct evidence in the affidavits from the syndicators. Group purchases were not unique to Tribune. Camellia freely admits that it too acquired programming in group transactions.

Camellia contends that Tribune initiated and achieved a group buying strategy in response to KDVR's entry into the Denver market. Tribune's internal memoranda show that Tribune was aware of this new competition in the Denver market in 1981, planned to use its advantage as a multi-market purchaser of programming and aggressively employed a group buying strategy to capitalize on this advantage. There is nothing inherently illegal about such a strategy. It becomes illegal only if Tribune exploits its market power in New York and Chicago to force the syndicators to make sales to KWGN when the syndicators preferred to sell to KDVR on different terms. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

There is ample evidence that Tribune negotiated for group deals; there is insufficient evidence that it had a firm business policy that it would only buy programs for the New York and Chicago stations on condition that the same program would go to KWGN as a part of a package. The evidence fails to show that syndicators could not sell their programs to Tribune stations individually, that they sold to KWGN when they would have preferred not to sell programs in Denver or would have preferred to have sold to another station in Denver.

Tribune was aware of new competition in the Denver market, as shown by a KWGN memorandum stating "[i]f they [KDVR] are successful in acquiring product, they will gain a foothold in the market and our [KWGN] share of audience will not increase" (Plaintiff's exhibit 2L at 400067) and "we are currently reviewing our entire inventory in light of the recent developments relating to the entry into the market of [KDVR] ... we intend to purchase as much product as is feasible." (Plaintiff's exhibit 82 at 038502). The awareness of this new competition was a factor in motivating Tribune's purchasing strategy. For example, a 1981 KWGN internal memorandum states "we have moved as quickly a possible to purchase off-network programming ... which belongs in the KWGN inventory. We will stay on top of this and look for ways to buy in conjunction with WGN [Tribune's Chicago station] and WPIX [Tribune's New York City station]." (*Id.* 84 at TC005175). An undated operating plan states that to acquire vital off-network programs, "[a] process is ... underway through Tribune Company Broadcasting to share program availabilities in each of the company's markets so that we can take advantage of group purchases of both new and re-issue syndicated program opportunities." (*Id.* 84 at 040600).

A 1982 long range strategy plan states that in order to "improve prime and late-fringe audience shares" KWGN needs to:

1. [p]urchase those syndicated program offerings which are the bread and butter of an independent station's schedule, and work closely with sister stations to gain maximum leverage in the program market place.

2. establish a market position for the KWGN evening news....

3. Improve our advertising effort....
(*Id.* 040597).

A Tribune 1983–1985 long range strategy plan states:

Our relationships with the major program suppliers is, for the most part, outstanding. The major suppliers such as

MCA, MGM/UA, Columbia, Taffner, Paramount, Worldvision, Warner Brothers, 20th Century Fox, frequently call on us first in the Denver market place. With McGraw Hill, General Electric and Gannett group broadcasters competing in group deals for product, and with the impending competition from Channel 31 [KDVR] and 14 independents, we have used the Tribune Company "clout" to position ourselves as major buyers in the market place. Pairing with WGN–TV Chicago and WPIX–TV in New York, we have been able to do several important syndicated deals. This should be continued in a very competitive era for syndicated programming. (*Id.* 2E at 400030).

A 1983 strategy plan states: "[t]o make effective use of group leverage, Tribune Broadcasting must create and maintain a unified group image among advertisers, employees, program suppliers and the broadcasting community in general." (*Id.* TC 006929).

Tribune's 1984 through 1986 strategy plans discuss with more detail Tribune's plans for maintaining its strength in the face of new competition. A 1984 long range plan states that in response to new competition in Denver and Chicago, Tribune stations must:

A. Maintain established program dominance.

B. Further enhance local image strengths.

C. Exploit established selling strengths. (*Id.* 33 at 400146–7).

Tribune intended to implement the strategy to "[m]aintain established program dominance" by:

A. Identify[ing] the most desirable program acquisitions in their markets [Denver, Chicago]. . . .

B. Aggressively seek to acquire this product as early as possible. Group buying and "ad hoc" relationships further this effort. (*Id.*)

Similarly, a 1984 strategy plan stated that KWGN should "[t]ake advantage of corporate and ad-hoc group clout to cost-efficiently secure product before it comes to market." (*Id.* 2L 400067).

A 1985 strategy plan state that KWGN wanted to increase its "audience share despite the presence of an additional competitor". (*Id.* 092 at 040739). In response to this stated goal, KWGN planned to

1. Prioritize programs identified for acquisition.

2. Communicate acquisition priorities to Tribune Broadcasting.

3. Participate in group negotiation in cases of mutual interest with Tribune stations.

4. When group acquisition is not possible, initiate Denver market negotiations. (*Id.*)

These strategy plans show that Tribune perceived its size and multi-city presence as an advantage, and planned to develop its group image to use this advantage in the face of new competition. Tribune discouraged individual stations from making offers to syndicators while group negotiations were in process. Additionally, when Tribune made group offers to syndicators, they were often a total group price without a market by market breakdown. Camellia argues that syndicators resisted group purchases and their resistance was overcome by Tribune's insistence on group deals but fails to point the court to any particular transaction demonstrating this. None of the strategy plans shows that Tribune was unwilling to purchase product individually or that it intended to refuse to purchase from syndicators who wanted to sell their product market to market. There is nothing illegal about using market advantages in business negotiations so long as the syndicators have the freedom of choice.

The plaintiff also relies on statements to Camellia officers by representatives of syndicators that they could not solicit Camellia's bid for a particular program in Denver because the program had been committed to Tribune. That anecdotal evidence is inadmissible hearsay and cannot be used to prove tying. It merely shows routine salesmanship.

Camellia has shown that it entered a Denver television market dominated by a Tribune station. In response to that new

competition, Tribune promoted its size appeal to syndicators to maintain market share. The evidence is inadequate to support a finding by a reasonable jury that Tribune used its market shares in New York and Chicago to force syndicators to sell programs to KWGN in Denver.

 Camellia asserts that the court should deny Tribune's motion because Camellia has presented enough evidence to proceed to trial on a tying claim under the rule of reason analysis. *Jefferson Parish* at 29–30, 104 S.Ct. at 1567–68. As a practical matter, Camellia's burden under the rule of reason is similar if not identical to that required under the *per se* analysis. *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir.1984). Camellia has not made such a showing.

Upon the foregoing, it is

ORDERED that defendants' motion for summary judgment on plaintiff's Sherman Act section one claim is granted and that claim is dismissed.