# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 24

### OCTOBER TERM, A.D. 2012

_February 26, 2013_

NATHAN R. BAKER and BRYNER
FARMS, LLC, a Nevada Limited
Liability Company,

Appellants
(Defendants),

v.                                                    S-12-0105

DAVID SPEAKS and ELIZABETH
SPEAKS,

Appellees
(Plaintiffs).

_Appeal from the District Court of Lincoln County_
_The Honorable Jere A. Ryckman, Judge_

_Representing Appellants:_
David P. McCarthy of David P. McCarthy, P.C., Laramie, Wyoming

_Representing Appellees:_
Paula A. Fleck and Susan L. Combs of Holland & Hart, LLP, Jackson, Wyoming.
Argument by Ms. Fleck.

_Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ._

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**DAVIS**, Justice.

[¶1]    While a lawsuit by Appellees David and Elizabeth Speaks was pending against Rosemary and Byron Baker, the Bakers transferred two parcels of real property to their son Nathan.  The original case resulted in a judgment against Byron, but a dismissal of the claims against Rosemary.  Appellees' judgment against Byron was upheld on appeal.  After learning of the decision in that case, Nathan Baker transferred the properties to a limited liability company he and his family controlled.

[¶2]    Appellees filed this case under the Uniform Fraudulent Conveyance Act and its successor, the Uniform Fraudulent Transfer Act.  While the case was pending, the limited liability company transferred the two pieces of property to trusts controlled by Rosemary Baker.  Appellees moved for summary judgment.

[¶3]    The district court found that all of the conveyances were fraudulent and granted a summary judgment permitting execution on the properties.  We reverse and remand because although the district court correctly found the conveyances to be fraudulent, Appellees failed to make the required prima facie showing that the properties were subject to execution on a judgment against Byron Baker alone.

## ISSUES

[¶4]    1.  Did Appellees make the required prima facie showing that they were entitled to execute on the property in question under the Uniform Fraudulent Conveyance Act?

2.  Are Appellants judicially estopped from arguing that Rosemary Baker owned an interest in the real property involved in this case?

## FACTS

[¶5]    This appeal involves a confusing and apparently obfuscatory series of real estate transfers calculated to prevent the property from being executed upon to satisfy a judgment.  The facts are complex, and the procedural history of this case is tortuous at best.

### Prior Litigation and Property Transfers

[¶6]    During 1999, Rex Byron Baker (Byron) entered into an agreement to build a log cabin for Appellees David and Elizabeth Speaks (the Speaks) on land they owned in Lincoln County.[1]  *Baker v. Speaks*, 2008 WY 20, ¶ 3, 177 P.3d 803, 805 (Wyo. 2008)

---

[1] Donald and Kathleen Speaks were also parties to the original case.  David and Elizabeth Speaks are now the only owners of the property and of the judgment involved in this case.

(*Baker I*). The work went badly, and the Speaks sued Byron and Rosemary Baker (Rosemary) for damages related to poor workmanship as well as failure to complete the construction and to pay subcontractors in 2003 – the date suit was filed is not clear in this record or in the opinion in the above case. *Id.* at ¶ 8, 177 P.3d at 805–06.

[¶7]   The Speaks claimed that Rosemary was a partner with Byron in his construction business, and that she was therefore responsible in damages for the allegedly faulty and incomplete work.   Rosemary's relationship to Byron at the time the suit was filed is unclear, and remains so to this day.  A recorded warranty deed to Lot 16 of the Corsi Ranchettes Subdivision dated in 1998 conveyed the property to R. Byron Baker and Rosemary K. Baker, husband and wife as tenants by the entireties.  The deed was not recorded until 2001.   The record contains no pre-2003 conveyance to the Bakers of a second parcel involved in this case, Lot 5 of the Misty Meadows Subdivision, which adjoins the Corsi Ranchettes parcel.

[¶8]   An affidavit executed by Rosemary and filed shortly after this action was commenced attests that at some unspecified point in time Rosemary and Byron owned the real property later conveyed, presumably referring to both lots, as tenants by the entireties.  In an excerpt from Rosemary's deposition which was filed in this case, there is an oblique and incomplete reference to the possibility of a common law marriage in Utah.[2]

[¶9]   In its decision letter in *Baker I*, the trial court found that Rosemary and Byron were not married at the time the Speaks contract was negotiated or while the construction work was in progress.  It did not specify whether the Bakers were ever married with proper formality or at common law in another state, whether they were married and then divorced, or whether they had been married, divorced, and then remarried at some point in time before the decision was rendered.  The trial judge in *Baker I* did not need to make any of those findings.

[¶10]  The record supporting the finding that Rosemary and Byron were not married at certain times is not before us. It is clear that Rosemary has gone by various names, including Rosemary Baker, Rosemary Kenworthy, Rose Baker, and Rose Kenworthy. There is no doubt that these are all the same person, but the nature of Rosemary's

---

[2] At the October 2011 deposition of Rosemary, starting on page 4, she testified that:

> A. I understand that if you are living together as man and wife in Utah, you are considered -- I think at that time, it was probably just overnight. It might be longer. It might be a year today. I'm not sure.

The preceding page of the deposition, including the question which prompted this testimony, was not part of the designated record upon appeal.

relationship to Byron at critical times remains a mystery.[3] It is undisputed, however, that whatever their legal relationship may have been at certain times, Byron and Rosemary are in fact the father and mother of Nathan Baker, who figures prominently in events about to be described.

[¶11] On May 16, 2003, the trial judge entered a scheduling order setting *Baker I* for trial on October 15, 2003. Unbeknownst to the Speaks, Rosemary and Byron transferred whatever interests they held in both lots to Nathan by quitclaim deeds dated October 1, 2003. The conveyances do not describe Rosemary and Byron as husband and wife.

[¶12] The trial did not take place on October 15, 2003, but was instead ultimately rescheduled to April 26-28, 2005. The trial judge granted the Speaks judgment against Byron for the sum of $239,359.37. *Baker I*, ¶ 8, 177 P.3d at 805–06. It found that Rosemary was not a partner in Byron's construction business, and therefore dismissed the claims against her. Counterclaims by the Bakers were also dismissed. The net effect of this ruling was that Byron became a judgment debtor of the Speaks, while Rosemary did not.

[¶13] While the appeal in *Baker I* was being perfected, briefed, and then decided, Rosemary lived on one parcel of the conveyed property with the parties' daughters, while Nathan lived on the other. Byron occasionally lived with Rosemary. The Speaks evidently did not attempt to execute on the judgment while the appeal was pending.

[¶14] *Baker I* affirmed the trial court's decision on February 22, 2008. Five days later, on February 27, 2008, Nathan transferred the Corsi Ranchettes and Misty Meadows lots to Bryner Farms, L.L.C. Bryner Farms was a Nevada limited liability company. Its managing members were Rosemary and Nathan, as well as Byron and Rosemary's daughters. Nathan later testified in deposition that Bryner Farms was "destroyed by this lawsuit a month after its conception and dissolved shortly after." According to him, Bryner Farms never actually commenced doing business, but he transferred the two parcels described above to it with the intention of starting a "nursery business, garlic business, produce, furniture, the whole wide variety of things."

---

[3] At her deposition, Rosemary could not explain why she went by different names at different times:

> Q: Before I forget, I've seen you referred to, and in fact, I think you've signed document[s] in this case, as Rosemary Kenworthy.
> A. Yes.
> Q. Can you explain why sometimes you go by Kenworthy and sometimes you go by Baker?
> A. No, I can't explain.
> Q. There's no --
> A. It just depends on the circumstances and who is talking – who I'm talking to at the time, because I go by both names.

[¶15] In September of 2007, before the decision in *Baker I*, the Speaks obtained a title report which reflected the transfer of the Corsi Ranchettes lot to Nathan in October of 2003. They filed this action against Byron and Nathan on March 4, 2008, alleging that the conveyance was fraudulent as that term is defined by the Uniform Fraudulent Transfer Act. They sought an order permitting execution on the Corsi Ranchettes property to satisfy the judgment against Byron. At the time they were evidently unaware of the existence of the Misty Meadows parcel or of the transfer of either property to Bryner Farms.

[¶16] The Speaks' claims continued to evolve by amendment as they discovered additional transfers. Byron filed a Chapter 7 bankruptcy in Wyoming on September 22, 2008, and he was discharged on December 31, 2008. The record reflects no action by the United States Bankruptcy Court concerning any interest in the two lots Byron was accused of having fraudulently transferred. The parties have not addressed what impact, if any, a finding of a fraudulent conveyance might have on the discharge he was granted in that forum, and that is not an issue we must consider. Byron was dismissed from this case after the discharge, although he continued to play a role in it, as will be seen.

[¶17] On January 19, 2010, while this case was still pending in district court, a third set of transfers occurred. Bryner Farms transferred the Corsi Ranchettes lot to Pat's Dream Project Trust, and the Misty Meadows lot to the MME Trust by separate quitclaim deeds. Rosemary is the trustee of both trusts, and Nathan is a beneficiary of both. Nathan admitted in a later deposition that these transfers were made to protect the property from the Speaks, and that they were like "taking money from one pocket and sticking it in the other pocket." Rosemary continues to live in the house in the Corsi Ranchettes lot, along with her daughters, and at times, Byron. Nathan lives in an apartment attached to a workshop on the Misty Meadows lot, because, in his words, "I'm a man you know. I'm a bachelor guy, you know."

***Proceedings in the Trial Court***

[¶18] The trial court record could hardly be more confusing than it is, and we acknowledge the district judge's extraordinary patience with Nathan and Rosemary's repeated efforts at delay, their ever-shifting theories, and their overt lack of respect for the court. At least three attorneys were retained and discharged amid accusations that they had made reasonable accommodations or stipulations not approved by Nathan. Both Nathan and Rosemary attempted to represent Bryner Farms, an L.L.C., which the trial court would not permit them to do. Nathan unsuccessfully challenged the judge for cause. Numerous motions to dismiss were filed. We will not discuss all of the procedural maneuvering that took place because it is not important to the resolution of this appeal. We will attempt to summarize only the pertinent portions of the record.

4

[¶19] The Speaks amended their complaint a number of times to address the transfers as they discovered them. They ultimately joined Bryner Farms, and filed a motion for summary judgment. They claimed that each of the transfers, beginning with the transfer from Rosemary and Byron to Nathan in 2003, was fraudulent, and that they should be allowed to execute on the property as permitted by both the Uniform Fraudulent Conveyance Act and its successor, the Uniform Fraudulent Transfer Act. Because the Uniform Fraudulent Conveyance Act was replaced by the Uniform Fraudulent Transfer Act in 2006, each act applied, depending on the dates when transfers were made. *See* 2006 Wyo. Sess. Laws, ch. 55, § 2 (repealing the Uniform Fraudulent Conveyance Act and enacting the Uniform Fraudulent Transfer Act in its stead, effective July 1, 2006).

[¶20] Appellants' position evolved as the litigation proceeded. At one point, Nathan Baker pointed out in a motion to dismiss that Rosemary Baker had some interest in the properties involved in the case, and that her interest, which had been transferred to him in 2003, was not subject to execution on a judgment against Byron alone. He claimed that the Corsi Subdivision lot was supported by consideration in the form of the "sweat equity" he had put into the property. He also claimed that the transfer of the property had taken place much earlier, and that the deed in 2003 was just a belated formality, whatever that may mean.

[¶21] Counsel for the parties eventually arrived at a stipulation for purposes of a scheduled trial. The only issue of fact identified was "Whether R. Byron Baker transferred his interest in Lot # 16 of the Corsi Ranchettes, Second Filing and Lot # 5 of the Misty Meadows Subdivision to Rosemary K. Baker in 1998." This issue turned on two documents which made their appearance in the case on December 27, 2011. They were attached to an "Objection to Plaintiff's Motion for Summary Judgment" filed by Appellants' counsel.

[¶22] The documents are handwritten, and they were not notarized or recorded, although they do bear the illegible signature of a purported witness. The text of each is similar, and reads as follows in the case of the Corsi Ranchettes parcel:

Real Estate Agreement

I, Rex Byron Baker, in good faith, do hereby waive and release to Rosemary Kenworthy a/k/a Rosemary K. Baker, any and all interest in Lot #16 of Corsi Ranchettes Subdivision, (as recorded and platted in the Office of the Lincoln County Clerk, in Kemmerer Wyoming), for fair and valuable consideration in trade for Rosemary Kenworthy's aka Rosemary K. Baker's interest in Greys River Square, Lot 608C, Lakeview Estates Subdivision, real property located in Alpine, WY, County of Lincoln, State of Wyoming.

5

Dated this 30th day of January, 1998.

/s/
Rex Byron Baker

I, Rosemary Kenworthy aka Rosemary K. Baker, in good faith, do hereby waive and release to Rex Byron Baker, any and all interest in Greys River Square, real property located in Alpine, WY, for full interest in Lot #16 of Corsi Ranchettes Sub., situated in Lincoln County, State of Wyoming.

Dated this 30th day of January, 1998.

Witness: /s/
[illegible] Rosemary Kenworthy aka Rose Baker

[¶23] Interestingly enough, this transaction would have taken place approximately nine months before the date of the warranty deed transferring either party an interest in the lot in question, rendering an already suspect document even more suspicious. Appellants' argument in opposition to summary judgment was that the two 1998 documents transferred all of Byron's interest in the properties in question before he was subject to the Speaks' claims, that Rosemary therefore owned the properties, and that she transferred them to Nathan in 2003 free from any claim by the Speaks.

[¶24] An affidavit of Byron Baker can be found in the record immediately following the hand-written agreements. In it, he explained that he received consideration for the agreement when he "received payment" from Rosemary in fulfillment of the real estate agreement. Attached was a 2001 settlement agreement between Rosemary and Byron and other owners of the Greys River Square property. It called for a $59,000 payment from the other owners to Rosemary and Byron. Appellees moved to strike the affidavit on the ground that Byron was not a party to the case at that point in time, and that he therefore could not file any pleadings in it. The certificate of service attached to the affidavit was signed by Byron, and it was not attached to any pleading signed by Appellants' counsel, lending support to the notion that Byron himself filed it. The trial court granted the motion, and its decision has not been challenged on appeal. We therefore do not consider the affidavit as part of the record in this case.

***Trial Court Ruling On Motion For Summary Judgment***

6

[¶25]  The district court granted Appellees' motion for summary judgment in a twelve-page decision letter dated January 12, 2012.  It analyzed each of the conveyances.  As to the 2003 conveyance, it found the following badges of fraud to have been established without genuine issue of material fact under the Uniform Fraudulent Conveyance Act:

- A transfer of property without adequate consideration while litigation is pending is a badge of fraud.  Nathan claimed that adequate consideration was paid for the two parcels in the form of sweat equity and in forgiveness of a $14,000 debt owed him by Byron.  The court found that family services like those performed by Nathan were not adequate consideration, and that there was no showing that $14,000 was adequate consideration for the transfer.

- A close family relationship between transferor and transferee.

- Retention of possession of the property transferred.

- Byron was left with virtually no assets after the transfer.

- Nathan did not present admissible evidence of the claimed 1998 contracts.

- The 2003 transfers took place at a time when Byron and Rosemary faced the threat of a judgment against them.

[¶26]  With regard to the 1998 Real Estate Agreements, the Court found that "[b]ringing the Real Estate Agreements without an affidavit of a witness qualified to testify about the Agreements constitutes the assertion of hearsay statements, which are not admissible." While we may not necessarily agree that contracts are hearsay, the putative agreements were not authenticated by an affidavit after Byron's self-filed affidavit was stricken, and the decision to strike them has not been challenged on appeal.[4]

---

[4] Contracts are an example of non-hearsay "verbal acts."

> In a wide variety of civil and criminal cases, words carry legal consequences or logical significance independent of their assertive aspect. Threats and demands for cash spoken by a gunman to his victim, for example, are verbal parts of a forced taking that support charges of robbery or theft. Also, in the case of a bargain struck by two people, in which one agrees to sell and the other to buy something at an agreed price, words make a contract that supports a claim for breach if either party does not perform. . . .
>
> .   .   .
>
> . . . On the civil side, obvious examples include cases involving contracts, in which spoken or written words express offer, acceptance, and terms of agreement. In addition, words may be critical in showing

[¶27] The trial court then analyzed the 2008 and 2010 transfers under the Uniform Fraudulent Transfer Act which had been adopted in 2006. It granted summary judgment which allowed the Speaks to execute on both the Corsi Ranchettes and Misty Meadows Subdivision Properties under the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act.

[¶28] After the decision letter issued, Nathan attempted to supplement the record, claiming that the parties' joint statement referred to above had been submitted without his approval,[5] and that it had been improperly relied upon in the summary judgment proceedings. The motion also sought to assert additional facts. A motion to strike the supplement was granted. That decision has not been challenged in this appeal.

[¶29] Rosemary Baker filed a "Motion for Constitutional Intervention" after the trial court issued its ruling. In it, she claimed that she owned the properties in question, that she had been denied due process as to her property interest, and that she, her son, and her family had generally been ill-treated by the district court. The trial court did not rule on her motion, which means that it was deemed denied ninety days after it was filed under Wyoming Rule of Civil Procedure 6(c)(2). No appeal was taken from the trial court's failure to allow intervention. This appeal of the decision granting summary judgment and permitting execution on the two properties was timely perfected.

## STANDARD OF REVIEW

[¶30] Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P. 56(c); *In re Mark E. Dowell Irrevocable Trust # 1*, 2012 WY 154, ¶ 15, 290 P.3d 357, 360 (Wyo. 2012) (citing *Cellers v. Adami*, 2009 WY 120, ¶ 8, 216 P.3d 1134, 1137 (Wyo. 2009)). We conduct a *de novo* review of orders granting summary judgments, using the same materials and standards the lower court used. *Id.*; *Gillett v. White*, 2007 WY 44, ¶ 9, 153 P.3d 911, 914 (Wyo. 2007) (citing *Hincks v. Walton Ranch Co.*, 2007 WY 12, ¶ 7, 150 P.3d 669, 670 (Wyo. 2007)). We recently explained that process as follows:

---

waiver, modification, rescission, reformation, estoppel, or even performance.

4 Mueller and Kirkpatrick, *Federal Evidence* § 8:18 (3d ed. 2007). We interpret the trial judge's ruling to be that the 1998 agreements had not been authenticated (shown to be what the proponent claims) as required by Wyoming Rule of Evidence 901(a), and that they therefore could not be considered.

[5] The joint statement was approved by Appellants' counsel at the time. The implication of the motion is that he acted without authority, an objection Appellants had raised with regard to other counsel they ultimately discharged.

The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

*Wyo. Med. Ctr., Inc. v. Wyo. Ins. Guar. Ass'n*, 2010 WY 21, ¶ 11, 225 P.3d 1061, 1064 (Wyo. 2010) (quoting *McGarvey v. Key Prop. Mgmt. LLC*, 2009 WY 84, ¶ 10, 211 P.3d 503, 506 (Wyo. 2009)).

[¶31] A genuine issue of material fact exists when "a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense." *Gillett*, ¶ 9, 153 P.3d at 914 (citing *Hincks*, ¶ 8, 150 P.3d at 670). We have further defined a material fact, for purposes of summary judgment, as

one having some legal significance, that is, under the law applicable to a given case, it would control in some way the legal relations of the parties; as one upon which the outcome of litigation depends in whole or in part; as one on which the controversy may be determined; as one which will affect the result or outcome of the case depending upon its resolution; and one which constitutes a part of the plaintiff's cause of action or of the defendant's defense.

*Mize v. N. Big Horn Hosp. Dist.,* 931 P.2d 229, 232 (Wyo. 1997) (quoting *Johnson v. Soulis*, 542 P.2d 867, 871–72 (Wyo. 1975)). A material fact "would necessarily affect the application of the appropriate principle of law to the rights and obligations of the parties." *Franks v. Olson*, 975 P.2d 588, 591 (Wyo. 1999) (quoting *Johnson*, 542 P.2d at 872).

[¶32] A party moving for summary judgment carries the initial burden to "make a prima facie showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law." *Gayhart v. Goody*, 2004 WY 112, ¶ 11, 98 P.3d 164, 168 (Wyo. 2004) (quoting *Moore v. Lubnau*, 855 P.2d 1245, 1248 (Wyo. 1993)). If the movant carries his burden, the burden shifts to the nonmoving party to present specific facts showing that a genuine issue of material fact does exist. *Gayhart*, ¶ 11, 98 P.3d at 168 (quoting *Moore*, 855 P.2d at 1248). If the nonmoving party produces a

genuine issue worthy of trial, we of course have no choice but to reverse an order granting summary judgment. *See id.*

## DISCUSSION

[¶33] Appellants first argue that the judgment in this matter should be reversed because the trial judge considered circumstantial evidence on a motion for summary judgment. We find that argument to be without merit. As we noted in a case in which we reversed summary judgment:

> We acknowledge that the evidence offered by Ahrenholtz in opposition to the motion for summary judgment was circumstantial in nature. However, "circumstantial evidence is not evidence of a lower order; the law makes no distinction between the weight to be given to either direct or circumstantial evidence." *John Q. Hammons Inc. v. Poletis*, 954 P.2d 1353, 1357-58 (Wyo. 1998).

*Ahrenholtz v. Laramie Econ. Dev. Corp.*, 2003 WY 149, ¶ 21, 79 P.3d 511, 516 (Wyo. 2003). Federal cases explicitly hold that circumstantial evidence may support the grant of summary judgment even in an area as complex as antitrust law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 593–97, 106 S. Ct. 1348, 1359–61, 89 L. Ed. 2d 538 (1986); *Camellia City Telecasters, Inc. v. Tribune Broad. Co., Inc.,* 762 F. Supp. 290, 291 (D. Colo. 1991). Where our rules are sufficiently similar to federal rules (as Rule 56 is), we consider federal decisions interpreting them persuasive. *See, e.g., Lake v. D & L Langley Trucking, Inc.*, 2010 WY 75, ¶ 18, 233 P.3d 589, 595 (Wyo. 2010); *Kimbley v. City of Green River*, 642 P.2d 443, 445 n.3 (Wyo. 1982) ("Rules 12 and 56, W.R.C.P., are virtually identical to their federal counterparts. We consider federal authority relative thereto to be highly persuasive.").

[¶34] Fraudulent intent can rarely be proven by direct evidence. To require the trial court to disregard circumstantial evidence which included the timing of conveyances, the family relationships involved, the absence of consideration, and occupancy of the property would make summary judgment impossible even in the clearest of fraudulent conveyance cases.[6] This Court and the district court must consider all of the evidence, direct and circumstantial, in the light most favorable to Appellants. *See Mark E. Dowell Irrevocable Trust*, ¶ 15, 290 P.3d at 360 (Wyo. 2012) ("We examine the record in the light most favorable to the non-prevailing party, giving that party the benefit of all favorable inferences that may be fairly drawn from it.") (citing *O'Donnell v. Blue Cross*

---

[6] *In re Reed's Estate*, 566 P.2d 587, 591 (Wyo. 1977), contains an excellent discussion of why circumstantial evidence is necessary to prove intent underlying fraudulent conveyances, and we need not belabor that point here.

*Blue Shield of Wyo.*, 2003 WY 112, ¶ 9, 76 P.3d 308, 312 (Wyo. 2003)).  After doing so, both must determine whether there are genuine issues of material fact, and if not, whether Appellees were entitled to judgment as a matter of law.  *Mark E. Dowell Irrevocable Trust*, ¶ 15, 290 P.3d at 360 (citing W.R.C.P. 56(c); *Cellers*, ¶ 8, 216 P.3d at 1137).

[¶35]  Appellants also argue that the judgment against them is void because Rosemary Baker was not joined as an indispensable party.  They rely on a sentence in one of her affidavits indicating that both parcels of property were held by Byron and her as tenants by the entireties.  They argue that her interest in the property cannot be used to satisfy a judgment against Byron alone, and that she should have been joined as a party to protect that interest.

[¶36]  The mysterious 1998 real estate agreements are not even mentioned in Appellants' brief, and play no part in their argument.  Appellees are quick to point out that this theory is completely inconsistent with the one presented in the trial court.  There Appellants argued that Rosemary was the sole owner of the property based on the 1998 agreements.  Here they argue that the property was held as tenants by the entireties and that she retained at least some interest that should have been protected by requiring that she be joined as an indispensable party.  Appellees argue that Appellants are judicially estopped from "blowing hot and cold" by taking these inconsistent positions.  We will address the question of judicial estoppel below.

[¶37]  However, we believe the first step to resolution of this appeal requires the proper application of the standard of review and a determination of whether Appellees made the required prima facie showing that the remedy of direct execution on a judgment against Byron Baker alone was appropriate.  To address that issue, we must examine the remedies available under the Uniform Fraudulent Conveyance Act, because we believe that the initial 2003 transfer is the proper focus to determine whether the remedy granted by the district court was appropriate.

***Creditors' Rights Under the Uniform Fraudulent Conveyance Act***

[¶38]  Before 2006, the  Uniform Fraudulent Conveyance Act provided the statutory mechanism for preventing and setting aside conveyances made to protect property from, among other things, execution on a judgment. Wyo. Stat. Ann. § 34-14-101 to -113 (LexisNexis 2005).[7]  The Act made fraudulent conveyances unsupported by fair consideration by those who were or would be rendered insolvent, regardless of the conveyor's actual intent.  § 34-14-105.  It made fraudulent conveyances by those who intend to incur debt or believe they will incur debt beyond their ability to pay if the

---

[7] The Act was adopted in 1929.  1929 Wyo. Sess. Laws, ch. 8, § 31. The 2005 and 2003 versions of the Act are identical (for purposes of governing law at the time of the October 2003 transfer), and we will therefore refer to the 2005 version.

transaction is not supported by fair consideration. § 34-14-107. It also made fraudulent conveyances made with the actual fraudulent intent to hinder, delay, or defraud present or future creditors. § 34-14-108. The Act makes other types of transactions which are not material to this case fraudulent as well.

[¶39] The Act provides different remedies for creditors whose claims have matured and those whose claims have not. As to creditors with unmatured claims, a court could:

> (i)     Restrain the defendant from disposing of his property;
>
> (ii)    Appoint a receiver to take charge of the property;
>
> (iii)   Set aside the conveyance or annul the obligation; or
>
> (iv)   Make any order which the circumstances of the case may require.

§ 34-14-111(a).

[¶40] Creditors whose claims have matured had the following remedies under the Act:

> (i)     Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim; or
>
> (ii)    **Disregard the conveyance and attach or levy execution upon the property conveyed.**

§ 34-14-110(a) (emphasis added). The obvious difference between the remedies is that the creditor with an unmatured claim is entitled only to have the court set aside transfers and to take other steps to maintain the asset until the claim matures or fails. He cannot execute on the property, because he has not yet obtained a judgment.[8]

[¶41] Once a judgment is obtained, the claim matures and the judgment creditor may attach and levy execution on the property conveyed. Wyo. Stat. Ann. § 34-14-110(a) (LexisNexis 2005). The successor to the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, maintains the same distinction, although it groups the

---

[8] The meaning of the term "mature" might be subject to debate in certain instances. However, it cannot be seriously contended that one could execute without a judgment, and so a judgment creditor's claims must be "mature." The Uniform Fraudulent Transfer Act eliminates any possible ambiguity by allowing execution against the property conveyed "[i]f the creditor has obtained a judgment . . . ." Wyo. Stat. Ann. § 34-14-208(b) (LexisNexis 2011).

remedies into a single statutory section. *See* Wyo. Stat. Ann. § 34-14-208 (LexisNexis 2011) (codified as amended at 2006 Wyo. Sess. Laws, ch. 55, § 1).[9]

[¶42]  From this it follows that the property sought to be executed against must be subject to execution; *i.e.*, it must be shown that it belonged to the fraudulent transferor before the transfer. There are judicially created exceptions to the Act.  In order for a conveyance to be fraudulent, it must transfer property which was or would have been subject to execution if it had not been transferred.  *Lending Textile, Inc. v. All Purpose Accessories*, 664 N.Y.S. 2d 979, 981 (N.Y. App. Div. 1997) (per curiam); *Marine Midland Bank v. Murkoff*, 508 N.Y.S. 2d 17, 23 (N.Y. App. Div. 1986);[10] *see* Wyo. Stat. Ann. § 34-14-102(a)(i) (LexisNexis 2005) ("'Assets' of a debtor means property not exempt from liability for his debts."); *see also Hamilton Nat'l Bank v. Halsted*, 31 N.E. 900, 901 (N.Y. Ct. App. 1892) (decided under common law preceding New York's adoption of the Uniform Fraudulent Conveyance Act).

[¶43]  In *Murkoff*, judgment debtor Norman Murkoff and his wife originally owned a house as tenants by the entirety.  After being sued individually as a guarantor on three notes, but before judgment was rendered against him, Mr. Murkoff conveyed his interest in the home to his wife.  The trial court found the transfer to have been made with the actual intent to defraud, but entered an order causing the judgments against him to be liens on the property "to the extent of Norman B. Murkoff's prior interest therein."  508 N.Y.S. 2d at 20.  The judgment creditor appealed, arguing that the trial court should have

---

[9] § 34-14-208 states:

> (a) In an action for relief against a transfer or obligation under this act, . . . a creditor, subject to the limitations in W.S. 34-14-209, may obtain:
> > (i) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> > (ii) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by law;
> > (iii) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
> > > (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
> > > (B) Appointment of a receiver to take charge of the asset transferred or of the other property of the transferee;  or
> > > (C) Any other relief the circumstances may require.
> (b) If a creditor has obtained a judgment on a claim against the debtor, the creditor,  if the court so orders, may levy execution on the asset transferred or its proceeds.

[10] The New York Supreme Court is the highest level trial court in New York State, but it conducts appellate review of the decisions of New York's lower courts, as it did in *Murkoff* and *Lending Textile*. The Court of Appeals is the appellate court of last resort in New York.

terminated the tenancy by the entirety, transformed it into a tenancy in common and permitted execution against Mr. Murkoff's interest, as well as granting judgment against Mrs. Murkoff for rents and profits.

[¶44] The *Murkoff* court found the transfer to be fraudulent, but then turned to the question of the available remedy. It found that the creditor could reach the Murkoff property only if it could have executed on it if there had been no conveyance. 508 N.Y.S. 2d at 23. It also found that Mr. Murkoff's interest in the property could not be severed by creating a tenancy in common, because Mrs. Murkoff owned a right of survivorship in the property, that the bank had no judgment against her, and that therefore it had no right to execute on that property right. *Id*. Of course, if Mr. Murkoff survived Mrs. Murkoff, he would then own the property, and execution could issue against it.

[¶45] The bank argued that it should be allowed to reach Mrs. Murkoff's interest in the property if only as punishment for willingly participating in a fraudulent conveyance, albeit an unnecessary one as it turned out. The Court commented as follows on that tempting prospect:

> Punishment is not a proper basis for granting relief in a fraudulent conveyance action. No matter how scandalous the conduct, punishment is a matter for other tribunals and, indeed, certain fraudulent conveyances come within the purview of the Penal Law. In a more modern context, the Court of Appeals has held that punitive damages are not properly awarded in a fraudulent conveyance action, reasoning that the act of removing property from the reach of a creditor is not misconduct so gross and wanton as to justify such an award. This is consistent with the uniform act, the purpose of which is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment. The remedies it provides are clearly geared toward re-establishing the status quo ante, rather than punishing the debtor. Depriving Abby of her survivorship interest is plainly punitive and it is not a permissible remedy.

*Id*. at 24 (citation omitted) (internal quotation marks omitted).

[¶46] The *Murkoff* court also declined to grant a money judgment against Mrs. Murkoff for participating in a fraud, holding that:

> Since the judgment appealed from gives the plaintiff the same rights it had prior to the conveyance, the lien of the judgment against Norman Murkoff remains as valid and enforceable as

14

> it was before the conveyance. A money judgment against Abby has no basis in statute or in case law.

*Id.* at 25 (emphasis omitted). The analysis in *Murkoff* is sound, and provides helpful guidance to the issues surrounding cotenants' rights under Wyoming's Uniform Fraudulent Conveyance Act. *See* Wyo. Stat. Ann. § 8-1-103(a)(vii) (LexisNexis 2011) (providing the following rule of statutory construction: "[a]ny uniform act shall be interpreted and construed to effectuate its general purpose to make uniform the law of those states which enact it").

### *Remedies Available to the Speaks*

[¶47] Unfortunately, it is impossible to determine from this record what interest Byron Baker held in the two lots in question. It is possible that he held an interest as a tenant by the entirety with Rosemary. To establish a tenancy by the entireties, a party must prove five unities:

> [T]here are technical requirements of a joint tenancy or tenancy by the entirety. There are four essential characteristics of either tenancy, viz., (1) unity of interest, (2) unity of title, (3) unity of time, and (4) unity of possession. For a tenancy by the entirety, there is of course the additional characteristic of unity of person which exists only in the case of a husband and wife.

*Wambeke v. Hopkin*, 372 P.2d 470, 475 (Wyo. 1962) (citing *Peters v. Dona*, 49 Wyo. 306, 54 P.2d 817, 820 (1936); 41 C.J.S. *Husband and Wife* § 31, p. 442; 14 Am.Jur., *Cotenancy*, § 7, p. 81).

[¶48] In Wyoming, property held as tenants by the entirety cannot be executed upon to satisfy a judgment against only the husband or the wife. *Talbot v. United States*, 850 F. Supp. 969, 974 (D. Wyo. 1994) (describing how a single spouse may not subject a property to a mortgage if it is held in a tenancy by the entirety); *Colorado Nat'l Bank v. Miles*, 711 P.2d 390, 394 (Wyo. 1985) ("[P]roperty held in such fashion [a tenancy by the entirety] is not subject to execution or other creditor's process for the separate debts of one of the spouses." (quoting E. George Rudolph, *The Wyoming Law of Real Mortgages* 9 (Wyo. Law Institute 1969))); *Ward Terry & Co. v. Hensen*, 75 Wyo. 444, 461–62, 297 P.2d 213, 220 (1956); *see also* Oval A. Phipps, *Tenancy by the Entireties*, 25 Temp. L.Q. 24, 34–35 (1951); Ralph E. Boyer, *et al.*, *The Law of Property* ch. 5, at 103 (4th ed. 1991) ("[A] creditor of either spouse cannot levy on the spouse's interest in the property owned by the entirety unless local law provides to the contrary.") (footnote omitted).

15

[¶49] There is an obvious question as to whether Rosemary and Byron were married. Wyoming does not recognize common law marriage, but it does honor common law marriages concluded elsewhere, at least for certain purposes. *Christiansen v. Christiansen*, 2011 WY 90, ¶ 11, 253 P.3d 153, 156 (Wyo. 2011) (citing *Jim's Water Serv. v. Eayrs*, 590 P.2d 1346, 1350 (Wyo. 1979)); *In re Roberts' Estate*, 58 Wyo. 438, 467–68, 133 P.2d 492, 503 (1943).

[¶50] On the other hand, if Rosemary and Byron were not married when they took title to the properties in question, no tenancy by the entireties came into being, even if they married formally or at common law later. *United States v. Craft*, 535 U.S. 274, 280, 122 S. Ct. 1414, 1421, 152 L. Ed. 2d 437 (2002) ("A tenancy by the entirety is a unique sort of concurrent ownership that can only exist between married persons."); *Wambeke*, 372 P.2d at 475; *Perez v. Gilbert*, 586 N.E.2d 921, 925 (Ind. Ct. App. 1992); *In re Estate of Snyder*, 880 S.W.2d 596, 599 (Mo. Ct. App. 1994); 41 Am. Jur. 2d *Husband and Wife* § 24 (2005); E. George Rudolph, *The Wyoming Law of Mortgages* 11 (1995) ("Both *spouses* must join in a deed to have an effective conveyance [of a tenancy by the entirety] . . . .") (emphasis added).

[¶51] The majority of states hold that an ineffective attempt to create a tenancy by the entireties results in a tenancy in common, although some hold that a joint tenancy results. *Great S.W. Fire Ins. Co. v. DeWitt*, 458 So.2d 398, 400 (Fla. Dist. Ct. App. 1984); *Davidson v. Eubanks*, 189 S.W.2d 295, 297 (Mo. 1945); 41 Am. Jur. 2d *Husband and Wife* § 41 (2005); Wendy Evans Lehmann, Annotation, *Estate Created by Deed to Persons Described as Husband and Wife but Not Legally Married*, 9 A.L.R.4th 1189 (1981 & Supp. 2011); 7 Richard R. Powell, *The Law of Real Property* § 50.02[3][b] (Michael Allen Wolf ed. 2000) (describing how "conveyances to joint grantees as husband and wife, who are in fact not married" may result in a tenancy in common). In this particular case, the one deed in the record does not mention a right of survivorship, suggesting that a tenancy in common arose if Rosemary and Byron were not married at the time of the transfer.[11]

---

[11] *See* Wyo. Stat. Ann. § 34-1-140 (LexisNexis 2011) (establishing statutory requirements for the creation of a joint tenancy or tenancy by the entirety); *Choman v. Epperley*, 592 P.2d 714, 717-18 (Wyo. 1979) (holding the common law presumption in favor of joint tenancies was effectively abolished by § 34-1-140 and relevant precedent); Boyer, et al., *supra*, at 104 ("While at common law a joint tenancy was preferred over tenancy in common, the reverse is true under state statutory provisions which generally provide that a conveyance to two or more persons creates a tenancy in common unless it is shown that a joint and not a common tenancy is intended."); 7 Powell, *supra*, at § 50.02[2] ("In the United States, virtually every jurisdiction has a statute that creates a presumption favoring tenancies in common over joint tenancies, or abolishes joint tenancies or the right of survivorship.") (citing § 34-1-140). Powell's treatise also explains how "statutory or judicial presumptions favoring tenancies in common are usually overcome by language in a conveyance indicating either that a joint tenancy or a right of survivorship is intended." 7 Powell, *supra*, at § 51.02[1].

[¶52] The point is that the record reflects that Rosemary owned some interest in at least one of the two parcels. A judgment creditor may execute on the judgment debtor's interest in either a tenancy in common or in a joint tenancy. Wyo. Stat. Ann. § 1-17-301 (LexisNexis 2011) ("Except for property exempt by law, all property of the judgment debtor . . . is subject to execution."); 48A C.J.S. *Joint Tenancy* § 37 (2004) (describing how a judgment creditor can levy against a joint tenant's interest in property before the joint tenant's death) (citation omitted); 30 Am. Jur. 2d *Executions, Etc.* § 154 (2005) ("[A] judgment creditor of one tenant in common may levy on that tenant's interest in order to satisfy a judgment."); 7 Powell, *supra*, at §§ 50.05[2], 51.03[4] (noting that "[c]reditors of an individual tenant in common may enforce their rights against the cotenant's interest," and applying this rule to joint tenants as well). If Rosemary and Byron were not married but owned the property jointly, Appellees can execute on Byron's interest, but not Rosemary's.

[¶53] With all of the foregoing in mind, we turn to the record in this case. The trial court correctly analyzed the record and properly concluded that the 2003 transfers were fraudulent under the Uniform Fraudulent Conveyance Act because they were made when both Rosemary and Byron faced the possibility of incurring a debt beyond their ability to pay. *See* Wyo. Stat. Ann. § 34-14-107 (LexisNexis 2005). The parties also stipulated to the general facts surrounding the transfers, including: (1) inadequate consideration for the transfers; (2) a close familial relationship among the parties to all of the transfers; (3) continuing to possess or benefit from the property after transfer; and (4) that the transfer took place during pending litigation.

[¶54] All of these badges of fraud, buttressed by Appellants' failure to show good faith or demonstrate adequate consideration, supported the court's determination that the 2003 transfer was fraudulent as a matter of law. *See In re Reed's Estate*, 566 P.2d 587, 591 (Wyo. 1977) ("The issue of actual fraud is commonly determined by recognized indicia, demonstrated badges of fraud, which are circumstances so frequently attending fraud; a concurrence of several will make out a strong case and be the circumstantial evidence sufficient to sustain a court's finding."); *id.* ("[W]here badges of fraud are established to prove actual intent; the burden of going forward with evidence of valuable consideration is on the party seeking to uphold the conveyance as against the claim of an attacking creditor.").

[¶55] However, if Appellees had discovered the transfers around the time they were made and had applied to the court for relief under the Act, they would only have been entitled to the remedies under § 34-14-111, because their claim had not matured. In other words, on a proper showing, the court could have restrained the transfer, appointed a receiver, set aside the conveyance, or entered such other order as it deemed necessary to

17

preserve the property to satisfy any judgment Appellees might ultimately receive.[12] Property held as tenants by the entireties is subject to execution by a creditor holding a judgment against both husband and wife. 7 Powell, *supra*, at § 52.03[3] ("Joint liabilities, of course, can still be satisfied out of the entirety."). Rosemary was a person who made a transfer in anticipation of incurring a liability she could not pay.

[¶56] On the other hand, Appellees would not have been entitled to execute against the properties because they had no judgment against either defendant as required by § 34-14-110(b). Because Appellees were unaware of the transfers, they did not seek any relief after the claims against Rosemary were dismissed.

[¶57] Appellees never obtained the right to execute against Rosemary's interest in the two properties because they did not obtain a judgment against her. If the property was held as tenants by the entirety, it could not have been executed upon on a judgment against Byron alone. *Colorado Nat'l Bank*, 711 P.2d at 394; *see* § 34-14-102(a)(i) ("'Assets' of a debtor means property not exempt from liability for his debts."). If it was held by the two under some other kind of joint tenancy, Byron's interest alone was subject to execution.

[¶58] Because Appellees did not make any showing of the extent of Byron's interest (if any) in the two properties vis-à-vis that of Rosemary, they failed to make the required prima facie case of entitlement to the remedy of executing on both properties under § 34-14-110(a)(ii). Because the required showing as to ownership by the judgment debtor was not made by Appellees, the burden to raise a genuine issue of material fact on that issue never shifted to Appellants. *Long v. Daly*, 2007 WY 69, ¶ 24, 156 P.3d 994, 1000 (Wyo. 2007); *Thunder Hawk by and through Jensen v. Union Pacific R. Co.*, 844 P.2d 1045, 1050-51 (Wyo. 1992); *O'Donnell v. City of Casper,* 696 P.2d 1278, 1287 (Wyo. 1985).

[¶59] Unless the two properties were held by Rosemary and Byron as tenants by the entireties, Appellees are entitled to follow Byron's interest and execute upon it. Unfortunately, with no record identifying the nature of the tenancy or Byron's interest in it, even as disapproving as we are of the conduct of Appellants in this case, we will be compelled to reverse unless Appellants are judicially estopped from arguing on appeal that the property in question was held in a tenancy by the entireties.

*Judicial Estoppel*

[¶60] Judicial estoppel is a doctrine intended to prevent a party from "blowing hot and cold"; that is, taking inconsistent positions. *City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, ¶ 107, 196 P.3d 184, 212 (Wyo. 2008). However, it applies to taking an

---

[12] They might also have sought prejudgment attachment under Wyo. Stat. Ann. § 1-15-103 (LexisNexis 2005).

inconsistent position in a subsequent case. Judicial estoppel binds a party by his judicial declarations in prior proceedings, and that party

> may not contradict them in a **subsequent proceeding** involving [the] same issues and parties. . . . Under this doctrine, a party who by his pleadings, statements or contentions, under oath, has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a **subsequent** action.

*Willowbrook Ranch, Inc., v. Nugget Exploration, Inc.*, 896 P.2d 769, 771 (Wyo. 1995) (citation omitted) (emphasis added).

> Under this definition, inconsistent claims made within a judicial proceeding do not create a judicial estoppel issue. The doctrine is not applicable.

*B & R Builders v. Beilgard*, 915 P.2d 1195, 1200 (Wyo. 1996) (citing *Zwemer v. Prod. Credit Ass'n of Midlands*, 792 P.2d 245, 246 (Wyo. 1990)) (emphasis omitted). This Court has applied the doctrine of judicial estoppel narrowly:

> An examination of the cases in which this court has considered the application of the doctrine of res judicata as that rule is precisely defined and its corollary collateral or judicial estoppel leads to the conclusion that the policy in Wyoming has been to apply those propositions rather narrowly. While those concepts will be invoked when appropriate to avoid repetitious suits involving the same cause of action, and the relitigation of matters actually litigated and determined in the first proceeding, to the end that the concept of finality is honored in litigation in the State of Wyoming, still they are not to be applied in a highly technical manner which would in a context such as this prevent litigants from presenting their claims against others for determination on their merits.

*Robertson v. TWP, Inc.*, 656 P.2d 547, 553 (Wyo. 1983) (citation omitted).

[¶61]  Although they have done so in inconsistent ways, Appellants have argued that Rosemary Baker holds some interest in the property involved in this case and that Appellees should not be entitled to execute upon her interest, or to execute at all if the property was held as tenants by the entirety. The doctrine of judicial estoppel does not bar us from finding that the trial court granted a summary judgment permitting direct

execution on the properties in question without the required prima facie showing that the properties were subject to execution. *See* Wyo. Stat. Ann. § 1-17-301 (LexisNexis 2011) ("Except for property exempt by law, all property of the judgment debtor . . . is subject to execution."); *Hladky Construction, Inc.,* ¶ 107, 196 P.3d at 212 ("Judicial estoppel bars only the changing of position in regard to facts; it does not apply to legal conclusions based upon facts."); *Allen v. Allen*, 550 P.2d 1137, 1142 (Wyo. 1976) ("We are at liberty to decide a case [and not invoke judicial estoppel] upon any point which in our opinion the ends of justice require, particularly on a point so fundamental that we must take cognizance of it.") (footnotes omitted).

## CONCLUSION

[¶62]  Nothing contained in this opinion is intended to suggest that the district court may not select an alternative remedy available under the Uniform Fraudulent Conveyance Act or the Uniform Fraudulent Transfer Act, or that it may not adopt its previous findings that the conveyances were fraudulent as findings under W.R.C.P. 56(d) and limit further proceedings to the question of the judgment debtor's interest in the property transferred in 2003.  We likewise do not imply that a determination of Rosemary and Byron Baker's interests in the property could not be resolved on summary judgment with a proper record.  We find only that Appellees failed to make the required prima facie showing that the properties upon which execution was ordered on summary judgment were in fact subject to execution to satisfy a judgment against Byron Baker alone, and accordingly reverse and remand for further proceedings consistent with this opinion.