# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 114

### OCTOBER TERM, A.D. 2024

**November 7, 2024**

RAFTER J RANCH HOMEOWNER'S
ASSOCIATION, a Wyoming nonprofit
corporation,

Appellant
(Plaintiff),

v.

STAGE STOP, INC., a Wyoming profit
corporation,

Appellee
(Defendant).

S-24-0050

*Appeal from the District Court of Teton County*
The Honorable Melissa M. Owens, Judge

*Representing Appellant:*
Leah C. Schwartz, William P. Schwartz, Parsons Behle & Latimer, Jackson, Wyoming. Argument by Ms. Schwartz.

*Representing Appellee:*
Brandon L. Jensen, Rachael L. Buzanowski, Budd-Falen Law Offices, LLC, Cheyenne, Wyoming. Argument by Mr. Jensen.

*Before FOX, C.J., BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]   Stage Stop, Inc., purchased a lot and an existing 50,000 square foot building in the Rafter J Ranch Subdivision (Rafter J Subdivision or Subdivision) in Teton County in 2021. The Rafter J Subdivision Homeowner's Association (HOA) subsequently sought a declaratory judgment that Stage Stop's proposed use of the building for workforce housing apartments violated the Subdivision's governing covenants, conditions, and restrictions. The district court granted summary judgment to Stage Stop, and the HOA appealed. We affirm.

*ISSUE*

[¶2]   Did the district court err in determining Stage Stop's proposed use of Lot 333 in the Rafter J Subdivision is permitted by the governing covenants, conditions, and restrictions?

*FACTS AND PROCEDURAL BACKGROUND*

**A.     Rafter J Subdivision and Lot 333**

[¶3]   The Rafter J Subdivision is a mixed-use subdivision encompassing 447.83 acres south of Jackson in unincorporated Teton County. The Teton County Board of County Commissioners (County Commissioners) officially approved the Subdivision's Plat, which was recorded in Teton County as Plat #330 in 1978. Plat #330 maps the location of 335 separate lots as well as other features of the Subdivision. Per the notes on Plat #330 (Plat Notes), the lots are mostly designated residential, with a few lots labeled for multiple dwellings. There are also lots set aside for facilities providing services and amenities to the Subdivision. For example, Lot 332 is designated as "Corral & Stables," and Lot 335 is identified as "R.V. Storage." The lot at issue in this appeal, Lot 333, is designated in the Plat Notes as "Ranch Headquarters & Local Commercial" and measures 5.37 acres. Only one other lot is designated in the Plat Notes as "Local Commercial"—Lot 334.

[¶4]   Rafter J Subdivision's Declaration of Covenants, Conditions, and Restrictions (CCRs) were filed and recorded by a partnership between developer Charles Lewton, Jerry Wilson and Floyd King (Declarant), in 1978. The CCRs initially state:

> NOW THEREFORE, declarant hereby declares that all of the properties described shall be held, sold, and conveyed subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with, the real property and be binding on all parties having any right, title, or interest in the described properties or any part thereof, their heirs,

1

successors and assigns, and shall inure to the benefit of each owner thereof.

The CCRs then define, specify, and restrict certain aspects of development and use on the lots within the Subdivision. For example, the CCRs include an article defining relevant terms (Article I), and articles related to property rights (Article II), maintenance assessments (Article IV), and design standards (Article VI). The CCRs also establish the HOA (Article III), set forth provisions related to future development (Article X), and include provisions related to enforcement, duration, and amendment (Article XII). Pursuant to Article III, the HOA has the authority to administer and enforce the CCRs.

[¶5] Because this appeal relates to the proposed use of Lot 333, two of the articles in the CCRs are particularly significant—Article VII and Article IX. Article VII, titled "Land Classifications. Use and Restrictive Covenants," includes three sections. Section 1, titled "LAND CLASSIFICATIONS," states that all land within the Rafter J Subdivision "has been classified into the following areas: (a) residential; (b) multiple dwelling; (c) commercial; (d) common area; and e) miscellaneous area[] as more particularly shown on Exhibit "C" attached hereto and made a part hereof by this reference." The Plat and the CCRs do not define any of those classifications except for "common area," which is defined in the CCRs. Exhibit C reads:

**EXHIBIT "C"**
**LAND CLASSIFICATIONS**

The lots within the Rafter J Ranch Subdivision have been classified in accordance with Article VIII [sic], Section 1, in the following areas:

| CLASSIFICATION | | LOT NUMBERS |
|---|---|---|
| (a) | Residential | 1 through 324 |
| (b) | Multiple Dwelling | 325 through 329 |
| (c) | Commercial Area | **333**, 334, and such portions of future developable property as may be designated |
| (d) | Common area | As designated on Exhibit "A" |
| (e) | Miscellaneous Areas | |
| | Church Area | 330 |
| | Public Facility Area | 331 |
| | Corral and Stables | 332 |
| | R.V. Storage | 335 |
| | Future Developable Property | As designated on Exhibit "B" |

(emphasis added).

2

[¶6]    Article VII, Section 2, titled "GENERAL RESTRICTIONS," contains nine subsections deemed "general restrictions [that] shall apply to all land, regardless of classification[.]"  These restrictions relate to general items including site plans, building permits, exterior improvements, water and sewer hookups, and a speed limit.  Article VII, Section 3, titled "RESIDENTIAL AND MULTIPLE DWELLING AREA: USES: RESTRICTIONS," includes thirteen separate subsections of covenants, conditions, and restrictions expressly related to the lots classified as "Residential" (Lots 1-324) and "Multiple Dwelling" (Lots 325-329).  According to Article VII, Section 3(a), "[e]ach residential lot shall be used exclusively for residential purposes, and no more than one (1) family, including its servants and transient guests, shall occupy such residence."  The section goes on to state "[e]ach multiple dwelling lot shall be used exclusively for residential, recreational, club and related purposes, and no more than one (1) family, including its servants and transient guests, shall occupy each unit located within such multiple dwelling lots."  Article VII, Section 3(a) expressly prohibits conducting "commercial, retail or other business activities" on or from residential or multiple dwelling lots, with limited exceptions, including for home-based activities (e.g., tutoring, babysitting, catering) and owners leasing their lots.

[¶7]    Article VII does not contain any separate sections related to lots classified as "Commercial Area."    Instead, the CCRs include a separate Article IX, titled "ADDITIONAL COVENANTS—COMMERCIAL."  In its entirety, Article IX states:

> Section 1. USE OF COMMERCIAL AREA.  Lots 333 and 334 are designated as commercial areas, and may be used for any commercial purpose, subject to these covenants and such restrictions as may be contained in deeds, leases, or other instruments of conveyance.

[¶8]    The CCRs also include Article VIII, titled, "ADDITIONAL COVENANTS-MISCELLANEOUS AREAS AND FUTURE DEVELOPABLE PROPERTY."  Section 2 of Article VIII expressly limits the use of four particular lots as follows:

> (a) Church area, lot 330, may be used for the construction, maintenance, and use for church or religious purposes, including the erection of such church buildings or facilities as may be necessary or incidental thereto, including recreational and educational uses associated with church purposes.
>
> (b) Public facility area, lot 331, may be used for public facilities, including but not limited to, school or educational purposes, fire or police protection facilities, public office

buildings, and related facilities and incidental buildings and improvements which may be necessary or desirable for a public facility.

> (c) Corral and stables, lot 332, shall be for the construction, maintenance, and use of corrals, stables, barns, and like buildings and facilities necessary for keeping, maintaining, and care of livestock.

> (d) R.V. storage, lot 335, shall be used for the construction, maintenance, and use of a facility for the storing of items not suitable for storage in the residential and multiple family dwelling area[s] including the storage of boats, recreational vehicles, trailers, campers, and other items. Such buildings, fences, security containers, or the like may be erected and maintained on said lot 335.

Article VIII also provides that if any of those miscellaneous areas are later conveyed to the HOA, the HOA has the right to determine their usage, except that they "shall not be further subdivided for residential or multiple family dwelling."

### B.      Prior and Proposed Use of Lot 333

[¶9]    Lot 333 currently includes a 50,000 square foot, two-story building. The County Commissioners approved construction of the building in 1998. From 2004 to 2021, the owner of Lot 333 operated the building as Legacy Lodge. Legacy Lodge was a for-profit assisted living facility providing residential units to elderly persons and other patrons. The owners of Legacy Lodge shuttered the business in 2021 during the COVID-19 pandemic. Stage Stop, a for-profit entity, purchased Lot 333 and the building on April 30, 2021.

[¶10]  The building on Lot 333 contains 57 residential units with kitchenettes, including studio apartments, one-bedroom apartments, and two-bedroom apartments. It also includes a commercial kitchen, common dining area, and parking lot with space for approximately forty vehicles. After purchasing the property, Stage Stop announced its intent to convert Legacy Lodge into apartments for workforce housing. Specifically, Stage Stop plans to offer apartments for lease to area employers in "blocks," with employers then leasing individual units to their employees. It is undisputed that Stage Stop desires to lease the apartments to members of the local workforce as a for-profit endeavor.

### C.      Related Litigation—*Brazinski v. Bd. of Cnty. Comm'rs of Teton Cnty.*

[¶11]  This is the second time Lot 333 has been the subject of an appeal to this Court. After purchasing Lot 333 and the accompanying building, Stage Stop petitioned the County

4

Commissioners for an amendment to the Rafter J Subdivision Planned Unit Development (PUD) and a conditional use permit (CUP) to convert the assisted living facility to workforce apartments. Although several Rafter J Subdivision residents objected on various grounds, the County Commissioners approved the requested amendment to the PUD and then approved a CUP, subject to several conditions.[1] The objecting residents then petitioned the Teton County District Court to review the County Commissioners' approval of amendments to the PUD and, after Stage Stop intervened, the district court affirmed the approval. In *Brazinski v. Bd. of Cnty. Comm'rs of Teton Cnty.*, 2024 WY 40, 546 P.3d 545 (Wyo. 2024), we affirmed the County Commissioners' decision amending the PUD to allow Stage Stop to use Lot 333 for workforce apartments.

[¶12]   However, as we indicated in *Brazinski*, the County Commissioners' decision only related to zoning. The County Commissioners' approval of the PUD amendment did not change the contractual rights and duties between landowners, including those associated with the CCRs as they relate to Lot 333. *Brazinski,* ¶ 29, 546 P.3d at 553. We observed in *Brazinski*, "[t]he objectors inform us in their opening brief that '[a]fter Stage Stop failed to give assurances that it would properly seek to amend the Covenants, the [Rafter J Homeowners Association] filed a separate action against Stage Stop for anticipatory breach of the Covenants, which is currently pending in the district court.'" *Id.*, ¶ 29 n.4, 546 P.3d at 553 n.4.

### D.      Current Litigation

[¶13] The current appeal arises from the separate action described in *Brazinski*. Specifically, in its Complaint for Declaratory Judgment, Injunction, and Damages (Complaint), the HOA claimed Stage Stop's planned use of Lot 333 for workforce apartments violates the CCRs because it is not a proper commercial area use per Lot 333's designation in the CCRs. The HOA asserted in the Complaint that, as a result, Stage Stop could only accomplish its proposed use through an amendment to the CCRs. The HOA sought a declaration of the appropriate use of Lot 333 under the CCRs and brought affirmative claims for anticipatory breach of contract, nuisance, and injunctive relief. Regarding the latter, the HOA asserted that without an injunction preventing Stage Stop's proposed use, operation of the building as workforce housing would be "a drastic and harmful deviation from the status quo with respect to the present and historic use of Lot 333."

[¶14]   Stage Stop responded to the HOA's Complaint with an Answer and Counterclaim. In its Counterclaim, Stage Stop sought declaratory judgment that its proposed use of Lot 333 did not violate the CCRs because it was a permitted "commercial use" under the CCRs.

---

[1] Conditions included, for example, a requirement that Stage Stop enlarge the parking lot and specific occupancy limitations such as requiring occupants be members of the Teton County workforce, with at least fifty percent of the units occupied by employees of critical service providers, local schools, licensed medical providers, or certain other care providers.

5

According to the Counterclaim, "commercial" has a broad range of meanings that would encompass an apartment complex like the one contemplated by Stage Stop. Stage Stop also sought a declaration that it is not required to amend the CCRs to accommodate its proposed use.

[¶15] The HOA and Stage Stop filed competing motions for summary judgment. Relevant to this appeal, the HOA asserted the clear and unambiguous meaning of the word "commercial" in both the CCRs and the Plat prohibited Stage Stop's proposed use of Lot 333 for workforce apartments because the apartments would be "residential" or "multiple dwelling" uses, which applied to other specifically designated areas in the Subdivision. On the other hand, Stage Stop argued the clear and unambiguous meaning of the word "commercial" and the phrase "any commercial purpose" permitted its proposed use. The district court granted summary judgment in favor of Stage Stop. The court found that renting out apartments as a for-profit enterprise is a "commercial purpose" allowed on Lot 333. It also found the phrase "any commercial purpose" in the relevant covenant broadly allows the use of Lot 333 for commercial purposes without detailed restrictions, compared with the many restrictions on lots designated as "residential" and "multiple dwelling." The district court explained if the Subdivision wanted to exclude certain types of uses on Lot 333, the CCRs could have expressly restricted uses in the same manner as they did in Article VIII for miscellaneous areas. Because it granted summary judgment in favor of Stage Stop, the district court also dismissed the HOA's affirmative claims for anticipatory breach, nuisance, and injunctive relief.

[¶16] This appeal followed.

### STANDARD OF REVIEW

[¶17] The interpretation of unambiguous covenants is a proper subject for a motion for summary judgment. *Omohundro v. Sullivan*, 2009 WY 38, ¶ 8, 202 P.3d 1077, 1081 (Wyo. 2009). However, "if covenants are ambiguous, their interpretation generally raises genuine issues of material fact and summary judgment is precluded." *Id.* (citations omitted). As a result, we invoke our usual standard of review:

> Summary judgment can be sustained only when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c); *Felix Felicis, LLC v. Riva Ridge Owners Ass'n*, 2016 WY 67, ¶ 29, 375 P.3d 769, 778 (Wyo. 2016). We review a grant of summary judgment deciding a question of law de novo. *Id.* We accord no deference to the district court on issues of law and may affirm the summary judgment on any legal grounds appearing in the record. *Sky Harbor Air Serv., Inc. v. Cheyenne Reg'l*

6

*Airport Bd.*, 2016 WY 17, ¶ 40, 368 P.3d 264, 272 (Wyo. 2016).

*Gumpel v. Copperleaf Homeowners Ass'n, Inc.*, 2017 WY 46, ¶ 24, 393 P.3d 1279, 1289 (Wyo. 2017) (quoting *Cheyenne Newspapers, Inc. v. City of Cheyenne*, 2016 WY 125, ¶ 10, 386 P.3d 329, 333 (Wyo. 2016)).

[¶18]   In addition, ["t]he interpretation of covenants imposing restrictions or conditions on the use of land is a question of law we review *de novo*." *Id.*, ¶ 25, 393 P.3d at 1289 (citing *Wimer v. Cook*, 2016 WY 29, ¶ 21, 369 P.3d 210, 218 (Wyo. 2016)).

*DISCUSSION*

[¶19]   The HOA does not appeal the district court's summary judgment order on its affirmative claims of anticipatory breach, nuisance, and injunctive relief.  Rather, its appeal is limited to the district court's declaratory judgment that Stage Stop's proposed use of Lot 333 is permitted by the CCRs.  As it did below, the HOA asserts Stage Stop's proposed use of the lot for workforce apartments violates clear and unambiguous language in the CCRs and Plat and is not a "commercial" use as contemplated therein.  The HOA also argues Stage Stop should be judicially estopped from asserting its proposed use complies with the CCRs because in the proceedings underlying our decision in *Brazinski,* Stage Stop said it would seek to amend the CCRs to permit the proposed use.

### A.        The CCRs are clear and unambiguous and permit the use proposed by Stage Stop.

[¶20]   Restrictive covenants "'are contractual in nature and we therefore interpret them as we would a contract.'"  *Winney v. Hoback Ranches Prop. Owners Improvement & Serv. Dist.,* 2021 WY 128, ¶ 46, 499 P.3d 254, 266 (Wyo. 2021) (quoting *Gumpel*, ¶ 29, 393 P.3d at 1290, and citing *Wimer*, ¶ 22, 369 P.3d at 218).  Our goal is "'to determine and effectuate the intention of the parties, especially the grantor or declarant.'"  *Wimer*, ¶ 22, 369 P.3d at 218 (quoting *Omohundro*, ¶ 9, 202 P.3d at 1081).

[¶21]   As with any contract, we begin our analysis by considering the plain language of the covenants.  "[T]he words used in the [covenant] are afforded the plain meaning that a reasonable person would give to them. …  When the provisions in the [covenant] are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties."  *Winney,* ¶ 47, 499 P.3d at 266 (quoting *Gumpel*, ¶ 29, 393 P.3d at 1290) (other citations omitted).

[¶22]   Covenants are ambiguous only if they are obscure in their meaning "'because of indefiniteness of expression, or because a double meaning is present.'"  *Winney,* ¶ 48, 499 P.3d at 266 (quoting *Reichert v. Daugherty*, 2018 WY 103, ¶ 16, 425 P.3d 990, 995 (Wyo.

7

2018)) (other citations omitted). "In the absence of an ambiguity, 'we adhere to the covenant's plain and ordinary meaning without reference to attendant facts and circumstances or extrinsic evidence.'" *Winney,* ¶ 48, 499 P.3d at 266 (quoting *Reichert,* ¶ 16, 425 P.3d at 995) (other citations and some quotation marks omitted).

[¶23]  In addition, we interpret covenants as a whole and read each provision in light of the other provisions to find the plain meaning. *Gumpel,* ¶ 29, 393 P.3d at 1290 (citing *Thornock v. PacifiCorp,* 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016)). "'We avoid interpreting provisions in a way that makes the other provisions inconsistent or meaningless.'" *Id.* (quoting *Thornock,* ¶ 13, 379 P.3d at 180).

[¶24]  The covenant at issue states, "Lots 333 and 334 are designated as commercial areas, and may be used for any commercial purpose, subject to these covenants and such restrictions as may be contained in deeds, leases, or other instruments of conveyance." The term "commercial" from Article IX is not defined in the CCRs.

[¶25]  To determine whether the CCRs permit Stage Stop's proposed use of Lot 333, the district court first looked to the express terms of Article IX of the CCRs. Specifically, the district court considered the phrase "any commercial purpose" in the sentence: "Lots 333 and 334 are designated as commercial areas, and may be used for any commercial purpose, subject to these covenants and such restrictions as may be contained in deeds, leases, or other instruments of conveyance." While the HOA and Stage Stop each asserted in summary judgment the term "commercial" was clear and unambiguous, each ascribed it a different meaning. Ultimately, the district court agreed with Stage Stop, concluding renting out apartments as a for-profit enterprise is a "commercial purpose" allowed on Lot 333. To reach that conclusion, the district court largely relied upon dictionary definitions of the words "commercial" and "any," but also examined the CCRs as a whole.

[¶26]  The HOA argues the district court erred both in its conclusions about the word "commercial" and its determination that the CCRs as a whole permit Stage Stop's proposed use. The HOA asserts the court erred by simply adopting the dictionary definition of "commercial." It argues the court should have adopted the definition of "commercial" from this Court's decision in *Winney,* ¶ 46, 449 P.3d at 266, and had it done so, it could not have concluded Stage Stop's proposed use was "commercial." The HOA also asserts that when construed in their entirety the CCRs contemplate a residential homeowners' community with mostly single-family residences and a few multiple dwelling lots, all of which are subject to express density restrictions. The HOA argues it is therefore inconsistent with the purposes of the CCRs to permit workforce apartments on a commercial lot, especially since they would exceed the density restrictions in the CCRs. Finally, the HOA asserts permitting Stage Stop's proposed use ignores the "fundamental home-ownership" character of Rafter J Subdivision as reflected in the CCRs as a whole.

[¶27]   We conclude use of the word "commercial" in the phrase "any commercial purpose" in Article IX is clear and unambiguous, and includes the use proposed by Stage Stop.  We reject the HOA's attempt to portray *Winney* as establishing a broad, all-inclusive definition of the word "commercial" in the context of all covenants, conditions, and restrictions governing subdivisions.  Rather, discussion of the word "commercial" in *Winney* was necessarily limited to the subdivision, covenants, and underlying dispute at issue in that specific case.  Finally, we conclude the CCRs as a whole permit Stage Stop's proposed use.

[¶28]   We recited a comprehensive dictionary definition of "commercial" in *Winney*:

> "occupied with or engaged in commerce or work intended for commerce" and "of or relating to commerce." *See* https://www.merriam-webster.com/dictionary/commercial. Black's Law Dictionary defines it as "[o]f, relating to, or involving the buying and selling of goods; mercantile"; "[r]esulting or accruing from commerce or exchange"; "[e]mployed in trade; engaged in commerce"; "[m]anufactured for the markets; put up for trade"; "[o]f, relating to, or involving the ability of a product or business to make a profit"; and "[p]roduced and sold in large quantities." Commercial, Black's Law Dictionary (11th ed. 2019). The plain meaning of "commerce" is "the exchange or buying and selling of commodities on a large scale involving transportation from place to place." *See* https://www.merriam-webster.com/dictionary/commerce. Similarly, Black's Law Dictionary defines "commerce" as "[t]he exchange of goods and services, esp. on a large scale involving transportation between cities, states, and countries." Commerce, Black's Law Dictionary (11th ed. 2019).

*Winney*, ¶ 64, 499 P.3d at 270.

[¶29]   Notably, in this case the word "commercial" in the covenant is also modified by the adjective "any."  As an adjective, the plain meaning of "any" is:

> 1: one or some indiscriminately of whatever kind:
> > a: one or another taken at random
> > b: EVERY used to indicate one selected without restriction
> 2: one, some, or all indiscriminately of whatever quantity

*See* https://www.merriam-webster.com/dictionary/any.

[¶30]  We agree with the district court that use of the adjective "any" in Article IX of the CCRs is significant and denotes "commercial use without restriction."  Put another way, "any" as an adjective to "commercial" in the context of Article IX plainly contemplates one, some, or all the "commercial" purposes defined above.  That includes "of, relating to, or involving the ability of a product or business to make a profit."  In short, Stage Stop's proposed use of Lot 333 to provide workforce housing as a for-profit endeavor is entirely consistent with the plain and unambiguous dictionary definitions of the words "any" and "commercial"  used in Article IX of the CCRs.  The HOA essentially conceded as much at oral argument, arguing instead that the district court erred by not applying a narrower definition of the word "commercial" from our decision in *Winney*.

[¶31]  *Winney*, however, was a much different case, and our analysis there related to the plain meaning of "commercial" in the context of an entirely different covenant.  As *Winney* itself demonstrates, words often have several plain meanings.  The plain meaning of words in any given circumstance depends on the context in which they are used.  *Winney*, ¶¶ 62-65, 499 P.3d at 270; *see also Fayard v. Design Comm. of Homestead Subdivision*, 2010 WY 51, ¶ 15, 230 P.3d 299, 304 (Wyo. 2010); *Gumpel*, ¶¶ 62-66, 393 P.3d at 1297.

[¶32]  *Winney* involved an exclusively residential subdivision and a covenant expressly prohibiting all "commercial activity" in the residential subdivision.  The covenant at issue stated:  "All lands covered by this deed shall be used for residential purposes only, and no commercial activity shall be conducted or permitted thereon."  *Winney*, ¶ 59, 499 P.3d at 269.  According to the Winneys, one of the other homeowners in the subdivision, Michael Jerup, violated the covenants by engaging in commercial activity from his property— operating a road maintenance and snow plowing business.  *Id.*, ¶ 58, 499 P.3d at 269.  Drawing from the very same dictionary definitions set forth above, we considered that the covenant at issue restricted use of land in the entire subdivision to "residential purposes only" and prohibited all commercial activity.  *Id.*, ¶¶ 64-65, 499 P.3d at 270.  Then, after concluding the covenant prohibited "a landowner from conducting or allowing the exchange of goods or services involving transportation from place to place on his property," we examined whether Mr. Jerup's conduct violated that covenant, ultimately concluding it did not.  *Id.*, ¶¶ 68-73, 499 P.3d at 270-72.

[¶33]  The context of the covenant at issue in this case demonstrates a different plain meaning involving the word "commercial" than the one in *Winney*.  The subdivision at issue is mixed-use, with residential, multiple dwelling, and commercial lots.  Unlike *Winney*, the lot at issue is expressly designated as a "commercial area," and the covenant in dispute pertains exclusively to the "use of commercial area[s]."  Rather than expressly restricting or prohibiting commercial activity, the covenant expressly permits it and uses the adjective "any" in doing so.  Considering the context within which the word "commercial" is used here compared to the context from *Winney*, it is evident *Winney's* definition of the word is not controlling or even relevant here.

10

[¶34] The HOA's argument that the CCRs construed in their entirety prohibit Stage Stop's proposed use is also unavailing. Again, context matters. In its brief, the HOA tells a compelling story of the "American dream" of home ownership in the Rafter J Subdivision, and correctly notes the CCRs include an initial declaration requiring protection of the value and desirability of the property therein. However, contrary to the HOA's argument, nothing in that declaration is inconsistent with or prohibits use of Lot 333 for workforce apartments. Rather, the HOA's argument requires us to ignore the plain language of Article IX and imply a restriction that does not exist in the express language of either the declaration or Article IX. Our rules of contract interpretation restrict us to the four corners of a plain and unambiguous contract and do not allow insertion of words under the guise of interpretation. *See*, *e.g.*, *Winney*, ¶ 47, 499 P.3d at 266 (quoting *Gumpel*, ¶ 29, 393 P.3d at 1290) (other citations omitted); *Reed v. Miles Land & Livestock Co.*, 2001 WY 16, ¶¶ 10-11, 18 P.3d 1161, 1163-64 (Wyo. 2001) (stating courts may not add language to a clear and unambiguous contract).

[¶35] The HOA also asserts Stage Stop's proposed use of Lot 333 is inconsistent with the intent of the CCRs because Article IX indicates such use is subject to the other restrictions in the CCRs, and the CCRs contain specific density restrictions in Article XI, Section 1, titled, "LOT SPLITTING: CONSOLIDATION." However, considering the plain and unambiguous language of the CCRs as a whole, the density restrictions in Article XI, Section 1 pertain only to multiple dwelling lots, and expressly exclude commercial lots like Lot 333.[2]

[¶36] Likewise, the HOA's argument that Stage Stop's proposed use violates the Declarant's design of the nature and character of the Rafter J Subdivision and disregards the distinction between the various land classifications again ignores the plain language of

---

[2] Article XI "GENERAL PROVISIONS" Section 1. LOT SPLITTING[;] CONSOLIDATION states:

    (a) Two or more contiguous lots within the Rafter J Ranch may be combined, provided notice of intention to consolidate such lots is filed with the design committee. Such consolidated lots may thereafter be treated as one building site, and such site may be subjected to these restrictions the same as a single lot except for the purpose of levying and collecting assessments.

    (b) No residential lot within the Rafter J Ranch shall be split, unless such lot as split is then consolidated with a contiguous lot, and unless the resulting area to be built on shall be larger than one lot.

    (c) Nothing contained in paragraphs (a) or (b) above shall apply to the splitting of any multiple dwelling lot which is specifically permitted provided, however, that the total maximum density for the multiple dwelling lots shall not exceed 163 units nor a density exceeding five (5) units per acre; and provided further than nothing contained in paragraphs (a) or (b) above shall apply to miscellaneous areas, commercial lots, or future developable property which may be split, subdivided or divide [sic] into separate parcels or tracts."

the CCRs. Specifically, the HOA asserts permitting Stage Stop's proposed use "would render meaningless the distinct residential/commercial/amenity use classifications and areas if every use were allowed everywhere." Neither the CCRs nor construing them to permit Stage Stop's proposed use would allow "every use everywhere." The CCRs are clear that Lots 1-324 are classified as "residential." Those 324 lots are subject to numerous restrictions in Article VII, Section 3. Among other things, they are "to be used exclusively for residential purposes" with only one family in each residence. In addition, and with a few exceptions, "[n]o commercial, retail, or other business activities are permitted." Lots 325-329 are classified as "multiple dwelling," and those five lots are also subject to numerous restrictions including a prohibition against commercial activities and specific occupancy requirements. Lots 330, 331, 332, and 335 are classified as "miscellaneous," and each has specific, express limitations on use. In fact, those limitations include an express prohibition against later subdividing them for residential or multiple dwelling use.

[¶37] The only lots classified for commercial use are Lots 333 and 334, and there are no express limitations on the type of commercial use on those two lots, except the general limitations in Article VII, Section 2 that apply to all lots. Had the Declarant intended any other limitations on the type of commercial use permitted, including the limitations cited by the HOA, they could have expressly included those limitations in Article IX. For example, they could have limited Lots 333 and 334 to specific commercial uses or to commercial uses that only serve the homeowners of the Subdivision, or to only locally owned businesses. They could have limited the hours of operation for anyone operating a commercial business on the lots. They could have instituted a different assessment structure for those two lots, depending on the type of commercial use or the number of businesses operating on each lot. They could have expressly prohibited apartments, hotels, bed and breakfasts, or anything else permitting overnight stays or bearing even a resemblance to residences. The Declarant knew how to express such restrictions, as best demonstrated by the limitations on the uses of Lots 330 (church area), 331 (public facility area), 332 (corral and stables), and 335 (R.V. storage). However, the Declarant did not do any of those things in the CCRs, and we will not supply missing language "under the pretext of contract interpretation." *Gumpel*, ¶ 42, 393 P.3d at 1293 (citing *Herling v. Wyoming Machinery Co.*, 2013 WY 82, ¶¶ 35-36, 304 P.3d 951, 960 (Wyo. 2013)). Instead, the CCRs express a clear and unambiguous intent that Lot 333 be used for "any commercial purpose." Nothing about the CCRs as a whole or any of the covenants cited by the HOA conflicts with this provision or with Stage Stop's proposed use of Lot 333 for workforce apartments, nor does anything in the CCRs demonstrate an indefiniteness of expression, or a double meaning.

### B. The Master Plan is inadmissible extrinsic evidence.

[¶38] The HOA asserts that a 1977 document titled "Master Plan" was "approved and recorded" such that this Court should consider it in interpreting the CCRs, and that this "Master Plan" further supports its various arguments about the intent behind developing

the Rafter J Subdivision. For example, the HOA argues the Master Plan includes "density restrictions" and labels Lot 333 as a six-acre "PU 7," corresponding to "planned community commercial" use.

[¶39]  No admissible evidence exists in the record that the document the HOA refers to as the Master Plan was ever recorded or filed. The document itself is unsigned and contains no stamp, marking, or other indication that it was ever filed or recorded in Teton County, or anywhere. The HOA also refers to a 2011 "Staff Report," apparently issued on behalf of the County Commissioners, asserting it includes an "approval date for Plat/Master Plan." However, and while that document indicates a Rafter J Master Plan was proposed, it states that only a *Master Plan Final Plat* was filed in the County Clerk's office as Plat #330. That is, the Staff Report the HOA relies upon states only that the Plat we considered above was recorded. Additionally, though the "Staff Report" in the record indicates the proposed Rafter J Master Plan is attached to the report, the attachment is not in the record such that we could review it to determine whether it was ever filed or recorded. More importantly, the CCRs do not discuss, much less incorporate, the Master Plan. As a result, we conclude the "Master Plan" is extrinsic evidence. Because we find the CCRs are clear and unambiguous, we will not consider it. *Winney,* ¶ 48, 499 P.3d at 266.

### C.      The HOA never argued to the district court the "local commercial" designation in the Plat was different or more restrictive.

[¶40]  On appeal, the HOA also argues that even if Stage Stop's proposed use is a permissible commercial use under the CCRs, it is not an appropriate *local* commercial use per the designation of Lot 333 as "Ranch Headquarters & Local Commercial" in the Plat Notes on Plat #330. According to the HOA, the Plat Notes limit any commercial use of Lot 333 to something that benefits or serves the needs of Rafter J's residents. The HOA also criticizes the district court for not determining whether Stage Stop's proposed use of Lot 333 satisfies such a requirement.

[¶41]  The absence of any such discussion by the district court is understandable—the HOA never raised this argument before the district court. The HOA's Complaint does not mention the Plat or Plat Notes, much less the phrase "local commercial"; the allegations relate solely to the land designations in the CCRs. The HOA referenced the Plat in the cross motions for summary judgment, but only in its argument that Stage Stop's proposed use of Lot 333 is not "commercial," but instead "residential" or "multiple dwelling." Throughout the proceedings before the district court, the HOA treated the Plat and the CCRs as synonymous with respect to the designation of Lot 333 for "commercial" use. The first time the HOA argued the word "local" from the Plat further restricted the commercial use of Lot 333 is in its appellate brief.

[¶42]  "This Court 'strongly adheres' to the rule 'that it will not address issues that were not properly raised before the district court.'" *Four B Properties, LLC v. Nature*

*Conservancy*, 2020 WY 24, ¶ 69, 458 P.3d 832, 849 (Wyo. 2020) (quoting *Courtenay C. & Lucy Patten Davis Found. v. Colorado State Univ. Research Found*., 2014 WY 32, ¶ 36, 320 P.3d 1115, 1126 (Wyo. 2014)) (other citation omitted). This includes arguments raised for the first time on appeal. In *Gumpel*, under similar circumstances, we refused to consider an argument that the language in a plat extinguished rights under pre-existing covenants because it was a new argument raised for the first time on appeal. *Gumpel*, ¶ 32 n.7, 393 P.3d at 1290-91 n.7. The primary reason for the rule is simple—it is inappropriate to reverse a district court for reasons the parties never presented to it, including legal theories. *Amoco Production Co. v. Dept. of Revenue,* 2004 WY 89, ¶ 53, 94 P.3d 430, 449 (Wyo. 2004) (citations omitted). For that reason, and because the HOA did not raise the issue of the meaning of "local commercial" below, we will not consider it now. *Hensel v. DAPCPA RPO LLC*, 2023 WY 84, ¶ 30, 534 P.3d 460, 468 (Wyo. 2023) (citing *Colton v. Town of Dubois*, 2022 WY 138, ¶ 2 n.1, 519 P.3d 976, 978 n.1 (Wyo. 2022) ("[T]his Court will not consider an issue raised for the first time on appeal unless it is jurisdictional or of such fundamental nature that it must be considered.")).

### D.   **Stage Stop is not judicially estopped from asserting the CCRs permit its proposed use.**

[¶43] Finally, the HOA asserted at oral argument that Stage Stop should be judicially estopped from claiming its proposed use complies with the CCRs. According to the HOA, Stage Stop committed to amend the CCRs to permit its proposed use in the proceedings underlying our decision in *Brazinski*. As a result, the HOA argues Stage Stop should not be permitted to now argue an amendment is not required. The HOA did not expressly argue for judicial estoppel in its appellate or reply brief. However, in the argument section of the appellate brief titled "Apartments are Not a 'Commercial' or 'Local Commercial' Use," the HOA arguably raised the issue. There, the HOA stated Stage Stop previously "recognized" it would need to amend the CCRs and "told the entire community it was 'willing to commence the CCR amendment process' to authorize apartments after the [County Commissioners] approved them." As support, the HOA cited to a letter counsel for Stage Stop transmitted to the County Commissioners in 2022 and then argued:

> Stage Stop now seeks to retreat from these positions, blowing hot and cold depending on the setting and the strategic context. *See Baker v. Speaks*, 2013 WY 24, ¶ 60 ("Judicial estoppel is a doctrine intended to prevent a party from "blowing hot and cold"; that is, taking inconsistent positions.") Having presided over the appeal of the PUD Amendment, the district court was aware of Stage Stop's inconsistent arguments as otherwise pointed out by the HOA. [ ] But the district court did not address this—stressing instead the HOA's past position from over 15 years ago authorizing the use of Lot 333 for assisted

living use. [ ] This was wrong for several reasons, as discussed *infra* at 33–36.

The brief contains no additional discussion of judicial estoppel against Stage Stop.

[¶44]   Our review of the record reveals the HOA also failed to raise this argument with the district court.  While the HOA identified "estoppel" as an affirmative defense to Stage Stop's counterclaim for declaratory judgment, it did not present any argument supporting judicial estoppel in its summary judgment motion or in response to Stage Stop's motion for summary judgment.  Again, we normally do not consider an issue for the first time on appeal.  *Hensel*, ¶ 30, 534 P.3d at 468.  However, and while the HOA's judicial estoppel argument is not jurisdictional and not of such a fundamental nature that we *must* consider it, we do have a duty to protect the integrity of Wyoming's judicial system.  *Williams v. State ex rel. University of Wyoming Board of Trustees*, 2019 WY 90, ¶ 22, 448 P.3d 222, 230 (Wyo. 2019); *Allen v. Allen*, 550 P.2d 1137, 1142 (Wyo. 1976).  As a result, and to leave no doubt about whether Stage Stop's conduct subverted the integrity of our judicial system, we consider the HOA's assertion of judicial estoppel.

[¶45]   In *Baker v. Speaks*, the only case cited by the HOA regarding judicial estoppel, we explained:

> Judicial estoppel binds a party by his judicial declarations in prior proceedings, and that party "may not contradict them in a subsequent proceeding involving the same issues and parties . . . Under this doctrine, a party who by his pleadings, statements or contentions, under oath, has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a subsequent action."

2013 WY 24, ¶ 60, 295 P.3d 847, 861 (Wyo. 2013) (quoting *Willowbrook Ranch, Inc. v. Nugget Exploration, Inc.*, 896 P.2d 769, 771 (Wyo. 1995)).  We noted the doctrine of judicial estoppel is narrow and applies only to changing positions as to facts.  *Id*., ¶¶ 60-61, 295 P.3d at 861 (citing *Robertson v. TWP, Inc.*, 656 P.2d 547, 553 (Wyo. 1983), and *City of Gillette v. Hladky Construction, Inc*., 2008 WY 134, ¶ 107, 196 P.3d 184, 212 (Wyo. 2008)).  Inconsistent claims and legal conclusions do not implicate judicial estoppel. *Id*.; *Bredthauer v. TSP*, 864 P.2d 442, 445-46 (Wyo. 1993).

[¶46]   The HOA's sole reference to an inconsistent position is to a letter to the County Commissioners signed by counsel for Stage Stop.  The letter states it is intended to update the County Commissioners on Stage Stop's application for a CUP and reiterate its commitment to provide workforce apartments.  In updating the County Commissioners about its discussion with the HOA about the CCRs, Stage Stop's counsel expressed its willingness to commence the process for amending the CCRs if its CUP was approved.

15

[¶47] Under these facts, judicial estoppel does not apply. While the letter was related to a prior proceeding—Stage Stop's application for a CUP—the proceeding did not involve the same issue or the same parties as this case. The statement about a willingness to commence the amendment process was also not a judicial declaration. Even if it was, it was not a statement of fact. At best the expression of willingness to pursue amendments to the CCRs implied such amendments were appropriate—or even required—but that is a question of law, not fact. *See, e.g., City of Gillette*, ¶ 108, 196 P.3d at 212 (holding judicial estoppel did not apply to inconsistent positions about whether a contract applied); *BackInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1240-41 (10th Cir. 2015) (holding judicial estoppel did not apply to an insurer who denied coverage despite an interrogatory response in a prior case indicating there would hypothetically be coverage). It is not troublesome— or even surprising—that Stage Stop's prior willingness to seek amendments to the CCRs soured after the County Commissioners' approval of the PUD was appealed and the HOA separately filed suit here. Stage Stop's counsel's statement in his letter to the County Commissioners is not susceptible to application of the narrow doctrine of judicial estoppel.

## *CONCLUSION*

[¶48] The district court correctly concluded Stage Stop's proposed use of Lot 333 did not violate the Rafter J Subdivision CCRs. The Master Plan referenced by the HOA is inadmissible extrinsic evidence, and the argument related to the "local commercial" designation in the Plat Notes was not properly raised before the district court. Although the HOA did not raise judicial estoppel below, the doctrine does not apply under the circumstances of this case.

[¶49] Affirmed.

16